# IN THE COURT OF APPEALS OF IOWA

No. 23-1892
Filed January 24, 2024

**IN THE INTEREST OF L.B.,**
**Minor Child,**

**K.P., Mother,**
    Appellant,

**D.B., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.

Two parents separately appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**

David R. Fiester, Cedar Rapids, for appellant mother.

Alexander S. Momany of Howes Law Firm, P.C., Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Julie Gunderson Trachta of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered by Ahlers, P.J., and Badding and Buller, JJ.

**BULLER, Judge.**

The mother and father of L.B. (born 2021) separately appeal termination of their parental rights. The mother challenges one of the statutory elements and asserts her bond with the child should preclude termination. The father also argues the permissive bond exception and makes other largely undeveloped claims. Guided by the juvenile court's credibility findings, the parents' history of false statements and deception, and the continued danger posed by domestic abuse, we affirm on both appeals.

## I.     Background Facts and Proceedings

In March 2022, the father was charged with and later convicted of domestic abuse assault—second offense for assaulting the mother. A no-contact order (NCO) was entered prohibiting the parents from any contact with each other. The Iowa Department of Health and Human Services (HHS) became involved later that month, when a deputy sheriff arrested both parents, who were together in the same car despite the NCO. The father was arrested for violating the NCO and possessing controlled substances—third offense (marijuana and cocaine), and the mother was arrested for violating the NCO and unlawfully possessing prescription drugs (Oxycontin). L.B., then about five months old, was also in the car.

HHS removed L.B. from her parents' custody and placed her with her maternal grandmother. L.B. tested positive for methamphetamine and tetrahydrocannabinol (better known as "THC") on a hair test in early April, and the juvenile court adjudicated her a child in need of assistance (CINA). The parents refused to provide a social history for L.B., and the court ordered them to do so at the dispositional hearing. The pair were also instructed to complete substance-

abuse evaluations and comply with all treatment recommendations as well as random drug testing. The court ordered separate visitation to keep the parents apart, based on the history of NCO violations and violence perpetrated by the father.

Despite the NCO, the parents lived together at L.B.'s paternal grandmother's home. An altercation between the parents in late April led to the paternal grandmother calling police and officers arresting the father for violating the NCO. During that police investigation, the father falsely claimed he was not living with the mother or spending time with her. Around this time, HHS removed the father's other children from his custody due to the issues in this case and a pending harassment charge against a family member. During this other HHS assessment, those children reported drug use and domestic violence by the father, as well as the father possessing a firearm despite his felony convictions. The father initially participated in services for that case, but he later told HHS he was "done" and wanted to terminate his rights.

Law enforcement arrested the parents again at the end of June following another traffic stop. The mother was charged with another violation of the NCO, and the father was charged with violating the NCO and possessing marijuana with intent to deliver.

By that September, the parents' visitation with L.B. had not progressed beyond full supervision. And the pair were still in a relationship. Based on the lack of progress toward reunification, the district court directed the State to file for termination of parental rights.

The parents claimed to separate in late fall. The mother reported to HHS they were no longer together, but the father still called the mother his "fiancé" during a mental-health evaluation. The criminal NCO was lifted in September, but in October the father let the air out of the mother's car tires, making her late to a scheduled visit. The juvenile court imposed its own NCO after the tire incident, and the mother told the court she and the father were no longer together.

In late December, the mother reported she had no contact with the father beyond small-talk while they were at the drug-testing facility. But HHS then received reports the mother and father were together at WalMart, where the father assaulted her in the parking lot. By January 2023, the mother progressed to semi-supervised visits with L.B. But the reported contacts between the mother and father were so frequent that L.B.'s guardian ad litem (GAL) considered recommending the mother's visits regress to fully supervised, as the GAL was worried the mother would allow the father to have unauthorized contact with L.B.

That spring, the father told HHS he would not participate in any further services and later text-messaged the HHS worker he "want[ed] to terminate [his] rights on all the kids." He then quit attending visits and stopped participating in services. During that same timeframe, the mother progressed to unsupervised visits, and the court continued the termination trial to allow more time for progress toward reunification.

Shortly after that continuance, HHS received additional reports that the father had attended at least one visit in violation of the juvenile court's NCO. In July, the GAL received a report that the father was present for at least one more visit, again in violation of the NCO. There were also multiple other reports that the

mother and father were spending time together, including from one of the mother's other children and from the GAL observing the mother's car at the father's home. The mother's other child said the mother instructed him "not to tell," but he was so upset and frightened he told anyway. The mother continued to deny contact with the father but also canceled a weekend overnight visit, claiming she had to attend a work trip. The mother regressed to fully supervised visits due to concerns by HHS and the GAL about continued prohibited contact between the parents.

These concerns turned out to be well-founded. At trial, both parents made significant admissions.[1] In the words of the juvenile court, "they essentially admitted to deceiving the Court and all parties about their relationship, their contact with each other, and allowing unauthorized contact between [the father] and [L.B.]." The parents maintained their relationship was now safe and free of violence or unlawful drug use, but the juvenile court did not believe them:

> The Court is unable to find the testimony of the parents credible in any way. They have consistently lied to all parties in this case. [The mother] went so far as to provide what she now admits is a forged hotel receipt to cover up the fact that she chose to forgo weekend overnight visitation with her child to secretly go to Chicago with [the father] for a dog show, all the while claiming to all parties that she was required to travel . . for work. [The father] testified that, throughout the case, despite all claims to the contrary, he and [the mother] were together as a couple for the entire time, with the exception of approximately one month.

---

[1] Through counsel, the father attempted to invoke his right against self-incrimination to avoid discussing his numerous violations of the criminal- and juvenile-court NCOs. The juvenile court ordered "that the State would not file any contempt actions based on any information [testified to] in this matter." We express no opinion on the propriety of such an order and note the father does not challenge it on appeal.

In the father's words, he and the mother knowingly violated the NCOs because "internally we knew that that's what our daughter needed." He expressed no regret over his actions. There was also evidence the parents kept "tabs" on each other with a shared iCloud account throughout the duration of the juvenile cases.

In his testimony, the father could not explain why L.B. tested positive for methamphetamine as an infant. He also acknowledged he had many opportunities to be honest with the court but failed to do so. And he described recently engaging in mental-health and domestic-violence services, including completion of the Iowa Domestic Abuse Program (IDAP) as part of his criminal sentence. He admitted to additional criminal history, including animal cruelty, "several" charges for domestic violence that resulted in at least three convictions, first- and third-degree harassment convictions, and two criminal NCO violations. And he agreed his own mother reported he abused her, but he said she "mistakenly" sought elder-abuse relief from the courts.

For her part, the mother also testified she had many opportunities to tell the truth about her continued relationship with the father. She admitted forging a hotel receipt as part of the scheme to deceive HHS and the court about the weekend visit she claimed to miss for work but actually spent in Chicago with the father. But she did not explain why she continued to lie to the lawyers, the court, service providers, and her own family. She also described conceiving a child with the father during a time she claimed to have no contact with him. At one point, she also told the court she did not consider herself a victim of domestic violence, even though the father pled guilty to assaulting her and she agreed he let the air out of her tires to punish or control her. Despite the history of abuse, the mother claimed

her relationship with the father was "good" and she had no concerns about his anger or temper. And she, like the father, claimed to not know how L.B. was exposed to methamphetamine.

The HHS worker testified L.B. could not be safely returned to the custody of either parent as of trial or in the immediate future. And HHS's primary concern was continued domestic violence. The worker testified this concern was magnified by the parents' dishonesty. As of trial, both parents had only fully supervised visitation, despite two prior extensions to work toward reunification.

According to the HHS worker, the mother continued to place her relationship with the father above L.B.'s safety. By way of example, the worker emphasized that the mother was on the verge of trial home placement when she canceled her weekend overnight visit. Instead, the mother chose a weekend with the father over that opportunity and forged a receipt to conceal her conduct. The HHS worker was also concerned that, because the parents were so successful at hiding their relationship, they may also be hiding ongoing domestic violence. In the HHS worker's view, L.B. was just as much a CINA at the time of trial as she was when removed.

Meanwhile, L.B. was doing well in placement with her maternal grandmother, who was a licensed foster parent and willing to adopt. According to HHS, the grandmother was supportive of the mother and hoped she would be successful. But the grandmother also had continued concerns about L.B.'s safety if she were returned to the mother's care, largely based on the father's history of violence. From her observations, the GAL reported a close bond between L.B. and her grandmother, as well as cousins who frequently visited the home. The

GAL also relayed the grandmother's concern that the mother was unable to place her child's needs above her own.

The State and HHS recommended termination of both parents' rights. The GAL also recommended termination, tempered with the observation that this was a "sad case." The GAL shared she wished the parents had made different choices instead of lying about their relationship and sabotaging potential reunification.

The juvenile court terminated both parents' parental rights pursuant to Iowa Code section 232.116(1)(h) (2022). The parents separately appeal.

## II.  Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "[W]e may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *Id.* at 707. "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* at 706.

## III.  Discussion

The mother challenges one of the statutory elements and urges the permissive-bond exception. The father does not contest the statutory elements, but he also urges that permissive exception—with other claims distinct from the mother's. We consider each parent's arguments separately.

### A.  The Mother's Challenge to Statutory Elements

The juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(h), and the mother challenges only the fourth and final element: whether "[t]here is clear and convincing evidence that the child cannot be returned

to the custody of the child's parents . . . at the present time." Iowa Code § 232.116(1)(h)(4). Under our case law, this section requires proof the child could not be "safely returned" to the parent's custody. *E.g.*, *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018).

On our de novo review, we agree with the juvenile court and the HHS worker's testimony that L.B. is in as much danger today as when she was adjudicated a CINA. The mother has no insight regarding the danger posed by her relationship with the father, as evidenced by her secretly continuing the relationship and allowing the father to see L.B. amidst additional reports of violence and controlling behavior—like letting the air out of her tires. Because of her age, L.B. relies entirely on adults for protection, and the mother lacks protective capacity not only for herself but also for her child. We have little reason to think the mother would leave to protect L.B. if the father resumed his long pattern of domestic abuse. *See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) ("[A] good prediction of the future conduct of a parent is to look at the past conduct."). And even if the father confined his abuse to the mother rather than the child, this is also a harm we must guard against. *See In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994) ("Children raised in homes touched by domestic abuse are often left with deep scars, revealed in the form of increased anxiety, insecurity and a greater likelihood for later problems in interpersonal relationships."). We affirm the juvenile court's finding there was clear and convincing evidence L.B. could not be safely returned to the mother's custody as of trial. *Cf. In re N.G.*, No. 23-0097, 2023 WL 2669845, at *4 (Iowa Ct. App. Mar.

29, 2023) (finding a mother's "lie[s] about domestic violence . . . directly impact[ed] the safety of the home").

Last, while it is true the mother made some positive strides during the case by engaging with services and maintaining stable employment and housing, these steps forward are all overshadowed by her campaign of deception to continue her relationship with the father and ignore the impact of domestic violence. We agree with the juvenile court that, despite many opportunities to choose otherwise, the mother continues to elevate her relationship with the abusive father above her relationship with L.B. We affirm termination on the statutory elements.

**B.     The Mother's Permissive Bond-Exception Claim**

Section 232.116(3) includes certain permissive exceptions that allow the juvenile court to decline termination despite evidence otherwise satisfying the statutory elements. One of these exceptions allows the juvenile court to decline termination if it "would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). A parent resisting termination has the burden to prove this permissive exception by clear and convincing evidence, and our case law recognizes that—without more—neither a parent's love nor the mere existence of a bond is enough to prevent termination. *In re A.B.,* 956 N.W.2d 162, 169–70 (Iowa 2021); *D.W.*, 791 N.W.2d at 709.

We question whether the juvenile court substantively considered and ruled on this issue below. But the court ruling contained this terse boilerplate: "the Court has considered each of the listed exceptions and find that none need be applied in this matter." We assume without deciding the issue was preserved and address the merits.

On this record, it seems uncontested there is a bond between mother and child. But it's similarly clear the mother repeatedly chose her relationship with the father over her bond with the child, despite criminal- and juvenile-court NCOs prohibiting contact. In any event, whatever the strength of the bond, we weigh it against the considerations that support termination. *See D.W.*, 791 N.W.2d at 709. We find the mother failed to prove by clear and convincing evidence that any detriment that may flow from severing the bond outweighs the need for stability and safety granted by termination. While the mother loves her child, she chose to continue her relationship with the father and ignore the very real danger posed by domestic violence. We decline to apply the permissive-bond exception for the mother.

### C.    The Father's Permissive Bond-Exception Claim

The father also appears to urge the permissive-bond exception. But his argument mixes in claims about the mother's bond. To the extent he urges the bond between mother and child should have thwarted termination, he lacks standing to make that challenge and—in any event—we rejected it on the merits in the preceding division. *See In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005) (applying the principle that one parent cannot assert facts or legal positions pertaining to the other parent).

As to the father's permissive bond-exception claim, we land largely in the same spot—with the added complication of convincing evidence that undermines the strength of any bond between father and child. Although the father disputes whether he meant it sincerely as to L.B., there is no question he told HHS he wanted to terminate his parental rights to "all the kids" and then ceased visits and

services for a significant period before resuming them as to this child (at first secretly and in violation of the NCO). Assuming the father satisfied his burden to prove a bond by clear and convincing evidence despite these hurdles, we find he failed to prove any detriment that may flow from severing the bond outweighs L.B.'s need for a safe and stable home. While the father claims he can safely parent and will no longer physically abuse the mother, his lack of credibility gives us no reason to believe him—and every reason to believe his criminal history of domestic violence will continue or resume in the future. *See, e.g.*, *N.F.*, 579 N.W.2d at 341 (past conduct is a good predictor of parents' future behavior). We decline to apply the bond exception for the father.

### D. The Father's Other Challenges

Although not presented under separate issue headings or with much clarity, the father seems to make a few other arguments in passing. To the extent these abbreviated claims are adequately presented for our review, we reject them.

First, the father seems to allege the juvenile court should have granted a six-month extension of time. But courts can delay permanency for six months only if the need for removal will be resolved in that time. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021). We reject this claim, as both formal and informal extensions of time had already been granted and the life of this juvenile case—which stretched some nineteen months—is well past the permanency guidelines. *Id.*

Second, the father argues the court should have entered a bridge order awarding the mother full sole legal custody and supervised visitation for him. *See* Iowa Code § 232.103A (permitting a juvenile court to close a CINA case, if specific criteria are met, by transferring jurisdiction to the district court). This was not an

option given the danger posed by custody with the mother, including the likelihood she would continue her relationship with the father and again secretly allow him unauthorized visitation with the child, potentially exposing L.B. to more domestic violence. *See In re L.M.*, No. 19-0426, 2019 WL 2373649, at *3 n.2 (Iowa Ct. App. June 5, 2019) (finding the use of a bridge order precluded by the "continued concerns for the children's safety").

## IV. Disposition

We affirm the termination of each parent's parental rights.

**AFFIRMED ON BOTH APPEALS.**